The United States Court of Appeals for the 11th Circuit is now open on 14th and Law. God save the United States from the darkness. Good morning. Please be seated. We're here for argument in No. 23-13958, Jeffrey Day Rieber v. Commissioner, Alabama Department of Corrections. We have Mr. Friedman here for Mr. Rieber and we have Mr. Baudry here for the Commissioner. Mr. Friedman, whenever you're ready. Thank you. Good morning. May it please the Court, I'm James Friedman from Godfrey & Kahn. We represent Petitioner of Appellant Jeffrey Day Rieber. With me is Nicole Talbot Settle, a paralegal at Godfrey & Kahn who has worked with me on this case for over 25 years. Thank you for granting our motion and hearing this appeal in this beautiful courtroom. The Court has agreed to hear two claims from Mr. Rieber's habeas corpus petition. First, that Mr. Rieber's trial counsel rendered constitutionally ineffective assistance based on a clear misunderstanding of the law during the guilt phase of the trial, which was prejudicial. And second, that Mr. Rieber's trial counsel rendered ineffective assistance based on a complete failure to investigate during the penalty phase. I will address the claims in that order. Trial counsel's failure to pursue the very strong alternative argument that Mr. Rieber was intoxicated at the time of the offense, hence making him incapable of forming Rieber's intent for capital murder, was constitutionally deficient. The alibi defense presented at trial was doomed to failure. It was based on the allegation that Mr. Rieber was at work at the time of the offense. But his time card showed he had clocked out well before the crime. There was a video of the crime. An eyewitness saw Mr. Rieber at the convenience store, the location of the crime, earlier in the day, and identified Mr. Rieber on the video as being the person he had seen. Can I ask you a question, please, Mr. Friedman? For the purposes of my question, assume that you can show that counsel rendered constitutionally ineffective performance, even under EDPA deference. The Alabama courts ruled that even if all of the evidence presented during the post-conviction hearing had been introduced, it wouldn't have been enough for Mr. Rieber to get an instruction on a lesser included offense. And so I'd like you at some point during, you don't have to do it now, but at some point during your argument about the guilt phase and effectiveness claim, I'd like you to address that issue. Thank you, Your Honor. I'm happy to do that now. Your Honor, there are a variety of cases, both out of Alabama courts and federal courts, defining the necessary intent for capital murder. And while some of them sound like stronger, more difficult standards, I believe at the end of the day, it has to be can the person form the intent necessary. And so whether they refer to that as, you know, extreme psychological distress and equate it more with mental health-type issues or whether they just talk about intent, the standard really almost has to be because one of the elements of capital murder is the intent to commit the crime. And if you can't form the intent, whether it's based on, you know, mental health issues or whether it's more limited and based on consumption of alcohol and drugs at the time, it has to be the same. It really has to be can't form the intent, the prosecution can't satisfy the one element of the claim. Are you asking us on that basis to somehow disagree with or overrule the Alabama court's view that that would not have been available under Alabama law? No, not at all. I think it's pretty clear it would have been available under Alabama law. And I think critically, Judge, it would have been a question for the jury. Once a certain amount of evidence, a threshold amount of evidence is presented on intoxication, the cases in Alabama say it should go to the jury to determine whether or not the element of intent can be satisfied. And our argument, based on the facts that we presented at the Rule 32 hearing, is that there was plenty of evidence to overcome that initial threshold and get that to the jury. And that's why Mr. Reber deserves a new trial where that can be one evidence put on, the argument made, and the court, more likely than not, would have put that in front of the jury. Well, let's go through the evidence that was introduced at the evidentiary hearing. You had a number of witnesses, several witnesses, I guess, who testified that at some point during the day he had consumed drugs and or alcohol. But you have nobody who testified that he was extremely intoxicated or high at the time of the murder. Isn't that right? I guess I would disagree maybe just on the way that you're framing that. He didn't start consuming drugs and alcohol until the middle of the afternoon. I think the crime was a little before 8 p.m. And he was there for several hours consistently consuming alcohol, marijuana, malt, and LSD, which is a very strong drug. Our expert witness testified about the effects of that. And that lasts for a very long time. And I think there also was testimony that he may have ingested some other drugs as well. Didn't his sister say that he didn't seem heavily intoxicated about an hour before the murder? I think at the real jury hearing his sister said that, but I think others said he consumed quite a bit of drugs. And I don't know that based on the drugs he consumed that you necessarily see any difference. And, again, we're starting from the premise that the state psychologist interviewed him. He walked through the drugs and alcohol he had used that day, talked to her about that day, and she came to the conclusion that more likely than not he was telling the truth and he had blacked out. And so the support at the Rule 32 hearing corroborated that. But we already have a state psychologist having interviewed this jury. We're coming to that conclusion. Obviously, there were plenty of witnesses who saw what went into Mr. Reber kind of forming this impaired state of mind where he was running into. Wasn't it also in Dr. Rogers' report that he remembered everything up to the point of the murder and he remembered everything after? So he only suffered this blackout that he reported during a very short period of time. Judge, I don't know if it was that limited, but I think the answer is yes. I think the extreme emotional state may add to that. Obviously, that's something for an expert witness. But, again, our argument here isn't we're not asking you to find that Mr. Reber committed a lesser crime than capital murder. We're suggesting that based on a combination of the Rogers report, all the evidence that we could have presented that could have been presented at the trial, that he deserves a chance to put on the evidence of extreme intoxication sufficient so that he could not have formed the requisite intent and, therefore, the jury should be instructed on potential lesser-included offenses. Are you arguing that the intoxication evidence should have been admitted in addition to the mistaken identity evidence or instead of? No, absolutely instead of. And what's critical, Judge, is really the timing on the defense. Mr. Kempner testified at the Rule 32 hearing that the first thing he did was go to the prosecution, go to the DA and say, is there any chance you would take death off the table if you will plead guilty? And at that stage, Mr. Reber had told the police, I didn't do it. And he was not asked by his lawyer whether he did it. And so Mr. Kempner went to Mr. Reber, knowing generally at at least a high level what evidence the state had, which is, I read this video. They found the gun, the money stolen, the clothes worn by the suspect at his house. He went to him and said, this is really strong. I think you should take this deal. Mr. Reber said, let me talk to my mom. And after that conversation, he chose not to. That happens first. Now, several weeks or months later, Mr. Kempner asks for Dr. Rogers to examine Mr. Reber. Dr. Rogers does show issues to report, and then she has an addendum to her report. Now Mr. Kempner has the Rogers report, which is really not inconsistent with what Mr. Reber said. Look, everybody says I didn't do it as the first thing out of their mouth. But it's not inconsistent because now he said, I don't remember. I don't know if I did it. It's not a completely inconsistent defense. It is really Mr. Reber contemplating what happened that night and saying, I don't remember. I have no idea what happened that night. A state psychologist agreeing with him. At that point in time, Mr. Kempner had a constitutional obligation to look into that. When he testified at the Rule 32 hearing, he didn't even ask Mr. Reber, were you intoxicated? Do you remember what happened? He made a decision not to even ask his client, even though he was presented with a vital defense from a neutral party, the state psychologist, that clearly would be consistent with the evidence the state had presented and consistent with what his client had said. Wouldn't that have meant that the guilt phase was all about your client smoking pot, using meth, dropping acid? Do you think that would have been a favorable case for the jury? Well, hang around. We're talking about the guilt phase. At the guilt phase, I think the answer is Mr. Kempner knew that this was not a strong case for the defense. He testified that he told Mr. Reber, and he thought to himself, this was one of the strongest prosecutorial cases he'd ever seen. He told Mr. Reber's mother, I'll see you at your son's funeral if he doesn't accept the deal. He testified to that. He knew that the alibi defense was a losing defense. And when he was presented with the writer's report, which again, was not really consistent, he said, I don't remember. And a psychologist believed him, and understanding the effect of the drugs and alcohol, the psychologist said, that's a distinct possibility. I think it's what happened, more likely than not. At that point, it is our argument that Mr. Kempner had to perform the research and investigation. And the reason he didn't, it was not a strategic choice. It was absolutely, positively not a strategic choice. A strategic choice means you're facing two alternatives, and you look into both of them and you pick one. And that's what this court and the Supreme Court have said many times before. It's a comedian versus Alabama. The Supreme Court said an attorney's ignorance of a point in law that is fundamental to his case, combined with his failure to perform basic research on that point, is a quintessential example of unreasonable performance under Strickland. And this court in Willis-Salem said reasonableness, indeed, suggests that a trial counsel would weigh competing theories and choose to present the most compelling theory among the various options. Mr. Kempner did not do that. He didn't do it because he testified at the Rule 32 hearing that from way back in 1990 until 2011 at the hearing, he thought you could not, that voluntary intoxication never could lead to a lesser included defense. That is simply not the case under Alabama law. The standard for how intoxicated you need to be is pretty high, but absolutely positively at the time of the crime and to this day, you can point at evidence that voluntary intoxication caused you to have a state of mind insufficient to form the intent necessary. I had understood that he testified at the Rule 32 hearing that intoxication could be used to negate the intent element. Are you saying that's not true? No, I think he said, I didn't think you could, and I didn't look into it. He may have equivocated a bit, but he did not say, I thought it could, but I made a decision not to based on some strategic reason. Rather, he believed that that was not a viable defense, and he testified that he did not look into it, and therefore he did not research it, excuse me, he did not investigate it, and if he had investigated it, obviously he easily would have found we had, you know, a half dozen or so witnesses who were with Mr. Reber while he was taking drugs, drinking alcohol within a few hours and if not closer to the time of the crime, and they not only would have supported this lesser included defense, but they also would have shown Mr. Kempner another reason why the allied defense didn't work, because Mr. Reber wasn't at work. He was with all these people, including his sister, at a party, getting drunk and taking drugs. So if Mr. Kempner had understood the law or researched it as he was required to provide constitutional assistance of counsel, he would have found out, oh, this is a viable alternative, and then he would have investigated and found witnesses as we did without great trouble many years later. Can you, in the time you have left, could you switch over to the penalty phase claim? Absolutely, Your Honor. The mitigation trial counsel's failure to investigate and present evidence corroborating Mr. Reber's history of drug use and intoxication the day of the crime also was constitutionally defective and prejudiced Mr. Reber's sentencing. Mr. Moran did not strategically or otherwise choose not to put on evidence of Mr. Reber's intoxication. In fact, the opposite is true. He relied on Robert's report during the sentencing phase of trial. In so doing, he was obligated to investigate that mitigating factor, but he failed to do so entirely even after the jury's recommendation, and despite being unnoticed, that the state would attack the argument based on a lack of corroborating evidence. Mr. Moran's time records prove that he spent 0.0 hours on anything between the jury's recommendation on sentencing and the hearing before the court almost two months later, despite having just heard the prosecution attack one of his mitigating factors. But wasn't the approach of showing what a polite, law-abiding citizen he had been before this crime effective in a way in that he did persuade the jury in a different direction, just not the judge? Wouldn't this evidence have undermined the view that your client was a good person who had some sort of off night? Your Honor, that could be an argument to the contrary. If Mr. Moran had not also presented to the jury the Rodgers report and argued to the jury and to the judge that Mr. Reber was intoxicated and didn't know what he was doing and therefore the jury should recommend life. If he had just chosen what I think is generally a losing argument, he's a nice guy, he's just been convicted of murder, that's not a terribly strong argument. But if he had just chosen to do that, our argument would not be as strong. But he didn't. He made a very conscious decision to put the Rodgers report into evidence and to make the argument again both to the jury and to the judge in sentencing that Mr. Reber was intoxicated at the time of the crime and that should be mitigating. But isn't it the case that if he had put on witnesses that they would have been cross-examined about his extensive drug use, about his relationship with the underage girl whom he got addicted to drugs? That seems aggravating rather than mitigating. Your Honor, that's absolutely correct. But the strategy should have been from the guilt phase on, the strategy should have been, an effective lawyer would have argued, he was under the influence of a lot of drugs and alcohol. He could not form the requisite intent. And even if you convicted him of capital murder, it should be mitigating. That should have been the argument because that's what happened. The reality is Mr. Reber started using drugs, as you know from the record, very early in life from his mom, he got marijuana. He continued that through high school. He was kicked out of the military based on drug and alcohol use. And all he was doing at this time, which is soon after he was kicked out of the military, was doing drugs and alcohol every day. I mean, that was the reality and that is a strong, one, potential defense with respect to guilt, but two, it leads to two of Alabama's mitigating factors. Do we think that's a strong defense in front of an Alabama jury that this person was kicked out of the military because of his drug use and had sat around using drugs for most of his life? I'm not sure that that would necessarily move a jury in the direction you're suggesting. Well, again, Your Honor, you're not arguing under those circumstances that this is a good person. What you're saying is this is a troubled person. This is a person who had a difficult life and who has been using drugs and alcohol, which have a permanent impact, a long-term impact on brain development, but also the night of, they impair your ability to think reasonably and act reasonably. And again, two of the mitigating factors under Alabama's statute, Section 13A-5-51, two of them would have been satisfied by that evidence. One, the defendant was under the influence of extreme mental or emotional disturbance, that's sub 2, or the lack of defendant's capacity to appreciate his conduct or conform his conduct to Alabama law, that's sub 6. So the Alabama legislature and the courts recognize that being under the influence, whether it's based on mental health or whether it's based on alcohol and drug use, can be mitigating for the same reason it could lead to a lesser-included offense. You're not thinking straight, and so you should be held less culpable. That is actually very standard in the death penalty context, as I'm sure the court knows well. The ABA is what you should be looking for in terms of mitigation. The ABA guidelines talk about drug and alcohol use as being a mitigator. I want to make sure that I am certain about all the evidence that was presented at the Rule 32 hearing about his drug and alcohol use on the day of the crime. So I understand that Joe Duffy testified that Reber came to her house at about dusk, which was around 630 or 7, and she might have seen him smoke pot or drink a beer, but she couldn't say for sure. Is that correct? Yes, that's what Ms. Duffy testified to. And then Daryl Moroney testified that Reber was at her house, Duffy's house, and when he arrived that afternoon, he couldn't say what time, just that it was during the daylight hours, and that although he didn't actually see Reber take acid, everybody there was high, so obviously he did. Is that a good summary of his testimony? Yeah, Daryl Moroney is the person from whom Reber obtained the acid, yes. Okay. And then that Samuel Williamson testified that she saw Reber snorting meth, smoking pot, and drinking alcohol at Joe's house, and she didn't specify a time, but responded in the affirmative when counsel asked questions about that night or that evening. Right? Correct. Was there any additional evidence about his drug use that particular day? At the Rule 32 hearing, I think those are the core witnesses. There were, I think, a few others, but, yes, that is the core evidence. So you've got people testifying about alcohol use, marijuana, LSD, and crystal meth. Yes, Your Honor. So, again, this is based on trying to find witnesses, you know, a decade, two decades later, and we were able to find people who had enough of a memory that they were able to identify which drugs Mr. Reber was using that day. If this investigation had been done at a time, you know, soon after the crime before the trial, there likely would have been additional evidence that would have been supportive corroborating of Mr. Reber's drug use and alcohol use that day. Part of your prejudice argument is that the trial judge who had the ultimate responsibility at the time for deciding what sentence to impose commented on the fact that there was no corroboration for the information contained in the Rodgers report. Yes, absolutely, Your Honor. The trial court clearly was very interested in these mitigating factors that I just noted under Alabama law, expressly asking Mr. Moran, I see a lot of this in the court of your argument. He was intoxicated. Do you have any corroborating evidence? And while there was a plethora of corroborating evidence available, Mr. Moran answered truthfully that he did not have any, and that's because he did not do the investigation. He did not talk to his client about it. He did not talk to the people that his client was with that night about it. When presented, you know, at the jury's part of the sentencing trial, when he was presented with an attack on the Rodgers report, do you have any corroborating evidence? No. State attacks you and says, see, there's no corroborating evidence. This is just Mr. Reber saying he was drunk and high at the time of the offense. He now has almost two months to go out and investigate this and get corroborating evidence because it's obviously going to be important. And the judge, the trial judge at the sentencing proved the importance by specifically asking, and Mr. Moran had to say, no, I don't have anything. He didn't have anything because he didn't do his job. He completely failed to investigate this potential line of mitigating evidence, even though he chose to present that argument to the jury and to the judge as a mitigating factor. Once he made that choice, it was incumbent on him constitutionally in order to do his job to go out and find the evidence that he could on that topic. He didn't. He took the easy way out. He did not look at the Rodgers report and said, here, I've got this Rodgers report. And even when he knew the state would attack it, he didn't go talk to any of these witnesses. He didn't even talk to Mr. Reber. I believe Mr. Moran had passed away at the time of the Rule 32 hearing, so we were unable to talk to him. He passed away, I believe, before we really were involved in this case. But Mr. Kempner testified that he and Mr. Moran never talked to Mr. Reber about drug use, even after getting the Rodgers report, even when Moran made the decision to present the report and to argue as a mitigator that Mr. Reber was intoxicated and couldn't form and didn't know what he was doing at the time of the crime. Speaking just for myself, I think you have a pretty strong argument on deficient performance, but I think your problem is prejudice. So would you talk about that? Well, with respect to the mitigation, I think the prejudice comes through in two ways. One, that there are, in fact, under Alabama law, the two mitigating factors that extreme intoxication can be supportive of. And so, again, the Alabama legislature and the courts have said these two are mitigating factors. There's only a small list of mitigating factors. But that also relies on the strength of your evidence at the evidentiary hearing about whether he was intoxicated and to what extent, doesn't it? You're right, Your Honor. And, again, we had to find this evidence a decade or two. I mean, the hearing itself was two decades after the crime. But we were able to find people who said, I was with him and either I saw him drinking, I saw him smoking pot, I saw him doing crystal meth, and everyone was doing LSD. And I'm pretty sure he was doing LSD. Well, what about his sister's specific testimony, both that she could tell when he was high and that he didn't seem high? Your Honor, I don't know what's going through his sister's mind, obviously, at that time. Others who testified at the hearing, others who we were able to find, did say he looked fine. But, you know, I don't know what Mr. Eber looked like, what his sister was going through his sister's mind at that time. But somebody who's drunk, stoned out of their minds to the point where they can't remember things, may sit there with a blank stare, but may not exhibit other evidence of intoxication. I don't have an answer, Your Honor, other than I don't think somebody looking at someone from across the room who hasn't necessarily been with him that much over the course of the previous several years, you know, Mr. Eber was out of the family home, whether she's an expert on whether he's intoxicated. We had an expert witness who talked about the effects of various drugs Mr. Eber took that day. And I think that evidence is stronger, you know, along with just the fact that he was seen taking all these drugs that day. And it was consistent with how he lived his life at that time and his history of drug and alcohol use from the point at which he was very young. So I see that my time is up, and thank you. All right, thank you very much, Mr. Friedman. You've saved your time for rebuttal. Mr. Boudreaux. Thank you, Your Honor. May it please the Court, Barrett Boudreaux on behalf of the Alabama Department of Corrections Commissioner. If Mr. Eber's attorneys had opted for the voluntary intoxication defense and made Mr. Eber's drug abuse the center of their case, it's very likely that we would be here today arguing about whether that decision constituted ineffective assistance of counsel. And it's easy to imagine what that argument would look like. At the guilt phase, we have the Alabama Court of Criminal Appeals holding as a matter of state law that the evidence that Mr. Eber presented at the Rule 32 hearing would not have been sufficient to get him the lesser included jury charge or the jury charge from voluntary intoxication at the guilt phase. And as for the sentencing phase, it's hard to imagine that an Alabama sentencing court would hear the evidence of Mr. Eber's longtime drug abuse, how he got other people addicted to drugs, how he probably committed statutory rape with Ms. Hubert when she was a teenager, and then determine that those were mitigating factors that outweighed the serious aggravating circumstances that a sentencing court wrote. But, Mr. Padre, whatever the ultimate strength of your argument, your presentation just skewed that evidence and didn't view it in the light most favorable to him. I mean, you've mentioned nothing about the favorable parts of the Rule 32 testimony, whatever that may have been. You mentioned the fact that he was a lifelong drug user. That wasn't the day of the trial, the day of the murder. You mentioned the possible statutory rape. That doesn't go to diminished circumstances or a diminished state of mind. So you're harping upon prejudice issues and not deficiency issues. Okay. I can move to deficiency, and maybe we can start with the… Well, let's start with this, and I understand fully, all of us do, that we need to apply the AEDPA standards to what the Alabama courts decided. So I have that in the back of my mind, so don't think I'm ignoring it. But if you're presenting an alibi defense based upon a defendant's being at work at the time of the murder, and the evidence clearly shows that he wasn't at work at the time of the murder, tell me how that is a reasonable defense. Yes, Your Honor. So you have the time card that Mr. Reber checked out of work around 1230, and then you have the testimony from Mr. Hunter, who was the owner of the business, who said after Mr. Reber checked out of work, he stayed, and he asked, can I stay here and use your tools to work on my car here at work? And that was the testimony that Mr. Hunter gave at the trial, and he said that Mr. Reber was still at work when he, Mr. Hunter, left around 5 p.m. Well before the murder. Well, Your Honor, it is important because Mr. Gentle, this whole eyewitness testimony, said that he saw Mr. Reber at the Mobile Mart around 5, 510 p.m. That was the first time that he saw Mr. Reber that day. That was eight miles away, so it's, you know, it's reasonable to think that Mr. Gentle was not perhaps being completely honest, and there is reason to think that. That he wasn't being honest about what? Either that he saw Mr. Reber at the Mobile Mart at 5 p.m., he told Mr. Brooks, the investigator, that Mr. Reber may have been wearing a plaid shirt that day or a flannel shirt that day. That was not corroborated by the video evidence. And then as for that video evidence, it's important to keep in mind. The state certainly believed him. I mean, that was part of the whole thing that he had been casing the joint, right? You took him at face value. You thought he was telling the truth. By you, I mean the prosecution team, not you personally. Yes, Your Honor, but I think it's. Now you're casting doubt on him? Your Honor, the question is whether a reasonable attorney representing Mr. Reber would have had a reasonable reason to cast doubt on his testimony. I think the answer is yes, and I think a large part of that goes to. . . It's consistent with the owner's testimony that he stuck around until he left around 5 p.m., and then 15 minutes later he was at the scene of the crime casing the place. I think 10 minutes later. . . People are off by 5 or 10 minutes. That's a normal occurrence. People don't get time right if they're not looking at their watch. And the owner could have been wrong by a couple of minutes, either side of 5 o'clock on his side. But when you add that to the video evidence, and my friend talked about how the video evidence was strong. Well, it's important to keep in mind this is 1990. The security footage was not actually a video. It snapped a photo once every four seconds, and then the photo that resulted was very grainy and very hard to decipher. And you had multiple witnesses testify at trial. You had Mr. Brooks, a longtime investigator, who said, I look at this photo, and I would be shocked if anyone could identify who this person was. You had Mr. Clark, who had owned a convenience store with similar security footage, who saw daily Mr. Reber on that footage. So if any witness could have identified Mr. Reber from video footage, you would think it would be him. And he testifies, I have no idea who that is. I could not identify that. And then you have Mr. Hunter, Mr. Reber's current employer at the time, who views the footage and says, I could not determine. . . I could not tell if that was my own brother from that footage. And this is a serious argument, and we know that because the prosecutor had to respond to it at length in his closing statement at trial. And he says, well, basically, yeah, Mr. Gentile, he was able to view the footage, and he was able to identify Mr. Reber in that footage, even though no one else could. And, jury, you just have to believe that that was true because even though he testified there wasn't facial marks or other physical characteristics other than Mr. Reber's body language that Mr. Gentile went by, that's just human nature. And even though no one else could identify Mr. Reber from that photo, Mr. Gentile could, and you need to believe Mr. Gentile. That obviously did not work. But Mr. Kempner's trying to cast doubt on that obviously was not ultimately successful, but it was a reasonable theory at the time. And particularly, I want to . . . But that's misidentification. That's not alibi. I'm sorry, Your Honor? But that's misidentification. That's not alibi. Well, I think it is the two go together. Not necessarily. When this . . . You cannot have an alibi and be misidentified as the person at the scene of a crime. I think . . . I guess I'm not exactly sure how to respond to that, except that in here, those two . . . The argument that Mr. Reber was not at the store because he was somewhere else and that there was significant doubt about who and how someone could identify Mr. Reber from the video evidence, I think those two things go together, and a reasonable attorney could have said, you know, that's our best shot. This is not a strong . . . This is an uphill battle, no matter which way you go. But that's a reasonable way to go. And I want to contrast that . . . Did you have a question, Judge Grant? My question was about something else. Go ahead. I'll ask you after you finish. Yes, Your Honor. So I want to contrast that with the evidence of voluntary intoxication that Mr. Reber says his attorney should have relied on. And one, that evidence was obviously very inconsistent with Mr. Reber's statement to the police later that morning at 3.30 a.m. when he was arrested. He said he was not at the Mobile Mart. And he said that when asked about whether he was intoxicated, he said, you know, I may have had a couple of beers when I got off of work. I may have smoked some pot that day. But that's it. He never mentioned anything about not remembering anything. He never mentioned any other drug abuse. What about the argument there that later the state psychologist, I think it was, concluded that he probably had blacked out? Wouldn't intoxication events have been similar with that? Your Honor, I think the – Consistent with that, I should say. I think the tagline from the Rule 32 court and the Rule 32's ruling on this was that to the extent that the report would have been admissible at trial, it would have been only about what Mr. Reber said and not the expert's ultimate conclusion on whether Mr. Reber was, in fact, intoxicated at the time. And that was the same reason that I think counsel agreed that their expert witness would not have been able to testify about that ultimate issue at trial about whether Mr. Reber was actually intoxicated at the time of the crime. And, of course, no one else could testify about that either. So we do have, as Your Honor went through, we have Cherry Hubert who said that she saw Mr. Reber around. I'm going to interrupt you a second since we've already covered that evidence. What's your view of the state of the record about trial counsel's knowledge or understanding about the intoxication defense? Yes, Your Honor. I'm glad you brought that up. So the key exchange on this at the Rule 32 hearing is on Document Entry 16-83 and then on pages 32 through 33. That's using the ECF pagination. And Mr. Kempner says, First, it was my understanding at that time that self-induced drunkenness, self-induced alcohol or drugs at that time, it was my understanding was no defense. And he goes on, and I want to get to that, but I also want to point out that that's actually a correct statement of Alabama law. And that's in the commentary to the code provision about voluntary intoxication, that it's not a defense. It could negate intent, but it's not a defense. So, so far, he is absolutely correct. And then he's asked, and would that include a defense that was not a total defense to the charge, but lesser included defense as well? Mr. Kempner answers, no, I think in some instances it could be used possibly as a mitigating circumstance, something like that. Question, as a mitigating circumstance for sentence for capital murder? Answer, yes. Question, how about as a basis for the inclusion of a lesser included offense, such as manslaughter? Here's the answer. Answer, it could be. The crime that involved specifically require an intent to be guilty, and I think that sometimes intoxication or dependency on drugs that can be used to negate intent. Again, that's an accurate statement of Alabama law. And then the question, did you consider that possibility at the time you represented Mr. Reber? Answer, briefly, because it didn't matter, because our position was he didn't do it. He also testified, and this is on page 14 of that same docket entry, that he discussed Dr. Rogers' report with code counsel, and they agreed at the time that their strategy would be that he didn't do it. But isn't it unreasonable to not investigate? If his understanding of the law, as you say, Mr. Bowdrey, was correct, and defense counsel have a report from a state psychiatrist, psychologist, which has all this information, isn't there an obligation to at least look into the possibility, for example, by asking your client some questions or seeing if there's any corroborating evidence of what he told Dr. Rogers? They didn't do anything. You can't just blind yourself and say this is our strategy. We're going full steam ahead. Nothing else matters, no matter how probative it might or might not be. You've got to at least look a little bit, right? Yes, Your Honor, and I think the fact that they commissioned Dr. Rogers' report, read it, discussed it, and then decided not to go down that evidence is sufficient. But the reason they gave is our position was he didn't do it. We're going with that defense. It wasn't because they thought her report is not credible. We can't find any corroboration. Mr. Reber, we've interviewed him and asked him about it, and he denies being intoxicated. They just did nothing. Am I wrong about that? It is true that they did ask Mr. Reber's siblings, some of whom lived with him at the time. They did interview those siblings, and some of those siblings testified that they asked them specifically about Mr. Reber's drug abuse. But not on that day. I'm not sure. Twenty years after the fact, they could not remember exactly what. I understood. Memories fade, and answers are less precise. I get that. But there's nothing, not in the billing records, not in their testimony, about them having dug even a little bit on this issue. I mean, if they had asked Mr. Reber and Mr. Reber had denied it, I think that would have been a reasonable investigation. Like, my client denies it, so I'm not going any further. Maybe he lied to Dr. Rogers. Or maybe you talk to someone who was with him, and that person says, yeah, he was doing drugs, but he seemed okay to me. He was functional. You're like, okay, well, I'm giving this up. But you've got to do something, it seems to me. You can't just, and this only goes to performance. I'm not talking about prejudice. But with regards to performance, you've got to do a little digging. I guess I would disagree, one, that commissioning Dr. Rogers was not a little bit of digging. That was sufficient for them to understand what that avenue, alternative avenue, might look like, and then they made the reasonable strategic choice not to go down that evidence. And second, they talked to Shawna Jenkins before trial. They talked to Dennis Howell before trial. They talked to Teresa Hill before trial, and she says in the Rule 32 hearing, I do remember that he asked me about drug use, and she said that she told the lawyer the same thing that she testified about at the Rule 32 hearing. Which was what? That Mr. Reber was a habitual drug user. Obviously, I admit it, she did not see Mr. Reber on that day, but it was evidence to corroborate Dr. Rogers' report that he was a habitual drug user. Yeah, habitual drug user I think is different than he was drunk that day, right? Because habitual drug user just makes him look like a bad person. I know that's not what the evidence is really coming in for, but the effect on the jury would likely be that. Whereas, if there was evidence that he was actually intoxicated, then that could negate intent, as we've discussed. They were doing something. They were investigating. They were asking the witnesses who were close to Mr. Reber at that time, what do you know? What do you know about Mr. Reber's drug use? So that's my point. But when you get a report from a psychologist that specifically says he blacked out during the murder, it seems to me that that's an argument why you should investigate, not that you already have. That you should investigate that further, and it doesn't look to me like there's any evidence that the relatives were asked about that specific thing, about his intoxication on the night of the murder. I guess, one, I'm not sure when those interviews occurred vis-a-vis or with regard to when they got Dr. Rogers' report. I'm not sure if it happened before or after. And then, obviously, you're right that the record is blank on what specifically they asked, and it was not our burden to show that. It was Mr. Reber's burden to show that. Let me ask you a different question. So the state courts found that the evidence of intoxication was insufficient, that nobody could testify he was actually that intoxicated at the time of the murder. But there was a lot of testimony, or a good bit of testimony, maybe enough testimony, that he'd consumed LSD, some amount of alcohol that seems high, and crystal meth. And why isn't that enough to show that he was very intoxicated, at least within hours of the time when he committed the murder? Yes, Your Honor. I think the simple answer is that the state court's determination of state law is binding on this court. But I also want to answer your question that there was a reasonable application of state law because the Alabama case law is replete with instances in which the courts make clear that, quote, evidence that the defendant ingested alcohol or drugs standing alone does not warrant a charge on intoxication. And that is in a bunch of cases, but just to cite one, that's from Vulture v. State, 341 Southern 3rd, 237. And of course, because what matters is his state of mind at the time, not whether he was, and obviously, you know, if you're consuming a bunch of beers or lots of alcohol right before the murder, that's indicative. But the court says you have to have something more than that. You have to have something that goes to what we know about his state of mind at the time of the crime. And here, there is simply nothing other than Dr. Rogers' report that would have shed any light on his state of mind at the time. And as for her conclusion, as I already said, that would not have been admissible at the time. And so there would have been insufficient evidence, as the court held, to get the jury instruction on volunteer intoxication. So if she had testified about the blackout, would that have been enough to get the issue to a jury? Not according to the Alabama Court of Criminal Appeals. So all of that drug use, as documented at the Rule 32 hearing, plus a psychiatrist's report that he may have blacked out during that period of time, that's not enough to get to a jury on a lesser-included offense? Not according to the Alabama Court of Criminal Appeals in this case. I know what they said in this case. I'm asking about Alabama law. Like, what else is needed under Alabama law? Well, I think, again, because all you have in Dr. Rogers' report is Mr. Reber's statement. Mr. Reber did not testify. He did not testify either at the trial or at Rule 32. Obviously, that's his choice. But that choice means that there's not evidence, firsthand evidence, about what his state of mind at the time was. And so all you have is the evidence that, yeah, some people may have saw him around drugs earlier that day, consuming drugs earlier that day, and the Court held that that was insufficient to warrant the jury instruction. Did Mr. Reber argue that the psychologist or psychiatrist's conclusion about the blackout could come in, or does everyone agree that that conclusion would not have been admitted? No, I don't. I want to be careful that I don't misrepresent the record. My understanding of the record is certainly they had this discussion with regard to the expert that Mr. Reber presented to talk about his state of mind at the time. And Mr. Reber's attorneys agreed that that expert could not opine about his state of mind at the time of the murder. And so applying that same reasoning, I think, would apply to Dr. Rogers. I don't know for sure whether there was an agreement about Dr. Rogers specifically. I just recall that agreement about their expert. I just think the same rule would apply. Is there any testimony from any of the lawyers that they were suspicious of the conclusion that he had blacked out at the exact time frame of the murder? I'm no psychologist. That does seem a little bit odd to me, and I wonder if they testified about that. I don't think Mr. Reber addressed that. Obviously, there is the state's argument that even Dr. Rogers recognized that it was a little bit suspicious that Mr. Reber has perfect recall of that entire day except, fortunate for him, those two hours in which the murder occurred. And then you also have the argument of Mr. Reber's sister who saw him an hour after the murder at 9 p.m., and she testified, both at sentencing and at the Rule 32 hearing, that he appeared perfectly fine, that she knew she could tell when he was high. He did not appear high. He was in good spirits. He had a friend over. He was talking on the phone. He wasn't in a stupor. He was in good spirits making jokes. And that was an hour after. So that, frankly, is probably the best evidence that we have of Mr. Reber's mental state at the time. And that probably goes to the prejudice question rather than the deficiency question. Would you agree? Oh, I think it would go to both, Your Honor, as to what a reasonable attorney would have known at the time. But you can't, but with regards to performance, as presented in this case, the lawyers would not have known the sister's testimony without speaking to the sister. And would not have been able to decide, that's not a theory worth pursuing. Your Honor, they did speak to the sister. And it was them who brought the sister to talk at sentencing. No, no, at the guilt phase. Did they have the information about her understanding of his non-intoxication on the day of the, on the evening of the crime? Did they have that information before the trial? I don't know for sure, Your Honor. We know that Ms., and we're talking about Shawna Jenkins, we know that she testified at the Rule 32 hearing, that she did speak to those attorneys prior to trial. This is on page 142, using the ECF paginations, the document from 1682. She doesn't quite remember about what, but we know that she spoke to the attorneys before trial. And then we know that the attorneys put her as a witness at the sentencing phase. So, take that for what it is. I think it is clear, or at least a reasonable inference, that the attorney would have known what she was going to testify about at the sentencing phase. Could you talk a little bit about the sentencing ineffectiveness claim, the penalty phase claim?  And specifically about the trial judge's observation that the information in Dr. Rogers' report was not corroborated, and therefore was not worthy of any weight. Yes, sir. Obviously, the judge asked about that and got the answer. I think now the question is, what weight would the trial court, would the Alabama sentencing court have given that evidence? And I think, just to skip to the prejudice prong of this, let's assume that the trial court did find that there was some mitigating circumstance, that maybe he had had some drugs that day, he was a lifelong drug abuser. Then the question is, weighing the aggravating circumstances and then weighing the mitigating circumstances, what would an Alabama sentencing court at the time have done? And has Mr. Reber shown a reasonable probability that the court would not have sentenced him to death? And I think the answer to that is clearly no. And we know that. Why do you say that? Because I think reading the sentencing order, it's very, very clear that the trial court was very moved by the aggravating circumstances and by its factual findings that this was a heinous, atrocious, or cruel crime compared to other capital offenses. And the court went on that. But all of those, I completely understand that all of us are working in an alternate universe of trying to predict going backwards what certain evidence might have done or might have affected or not. So I get the difficulty of that exercise. But understanding that, the heinousness of the murder is put into a certain context if you figure out or believe that a person was not acting with all of his wits about him at the time of the murder, right? To some extent, Your Honor, I think here it's a little bit different because of the trial court's factual findings that Mr. Reber planned the murder, that he got the gun a week ahead of time, that he had stalked the victim, that the victim was afraid of Mr. Reber, that a few days before you had testimony that one of the witnesses saw Mr. Reber there, told the victim to call the cops, and he left. And then was so worried about it that he went back to the store to make sure that everything was okay, and he left when he saw Mr. Reber drive away. That was two to three days before the murder occurred. And then you have the day of, you have Mr. Gentile testifying that he saw Reber there, 5 p.m., that then again the victim asked Mr. Gentile, who is this person, and Mr. Gentile testified that he told the victim, oh, I don't think Mr. Reber would do something like that. Well, lo and behold, three hours later, her fears came true, and Mr. Reber did do something like that. Was there any evidence from anyone at the scene that he appeared intoxicated? The only witness to the crime was the victim, Your Honor. But in the video, you know, was there any suggestion that the video indicated some level of intoxication, or that when he was kind of stalking around earlier that day that he appeared intoxicated? No, Your Honor. There's no testimony about whether you could tell he was intoxicated from the video. I also want to point out that in considering the mitigating evidence about his drug abuse, that also, you know, that's a double-edged sword for a sentencer to find, particularly here when Mr. Reber sold the $506 and in all likelihood did so to feed his drug addiction. And then you also have opening the door to other testimony. Instead of the sentencing court hearing witness after witness after witness about how good a guy Mr. Reber was, how his neighbors trusted him, instead the focus would have been Mr. Reber's a drug addict who his own brother says could not be trusted with money because the one time that he was responsible for paying rent, he instead used that money to buy cocaine, not rent, power, he instead used the power money to buy cocaine and was found snorting cocaine in a dark house. I didn't focus on this because obviously it's not an issue in what we're looking at, but was the motive theory that he did this for money or for some other reason? Your Honor, I think the theory was that it's not exactly clear why he did this, but the prosecutor argued that obviously he had the intent to kill, not necessarily just to steal the money, and we know that because he went in, shot the victim, stole the money, and then reached over and shot the victim again. So there was no broader theory about why he perhaps was targeting her or was hanging around, right? I believe that is correct, but if all this evidence about his drug use had been admitted, it's likely to think that that would have been more of a theme that he did this to feed his drug addiction. So again, this is a double-edged sword. Unless the Court has any other questions, we ask the Court to affirm the judgment below. Thank you, Your Honor. All right. Thank you very much.  I'd like to hit on a few topics during rebuttal. First, Judge Grant, I'd like to respond to your question about Mr. Reber's sister's testimony that he didn't look like he was that drugged up at the time, and I think it's critical to recognize, as the State pointed out, that Dennis Howell also testified at the Rule 32 hearing, and he said he saw Mr. Reber not too long or in the evening of the crime, and he said, quote, he was sitting in a recliner and just constantly rocking back and forth, nonstop, for 45 minutes to an hour. He testified this was behavior that was inconsistent. You'd never seen Mr. Reber do this before, and that he thought it was quite unusual. So there is testimony in the record. At what time? What time was that? Dennis said immediately after the crime. He saw he was not, I don't think, at the party before. He saw Mr. Reber right after the crime and said he looked quite odd, like he was, in fact, on drugs at that time. Did he tie it to drugs, or did he just say he'd never seen him act like that before? I mean, the witness. Did the witness tie it to drugs? I apologize, Your Honor. I'm not certain about whether he tied it to drugs. He did testify that he was aware that Mr. Reber consistently used drugs at the time, which leads to my second point, which is while Sean Reber may have said, well, he didn't look that drunk or high at a particular point in time, she and her brother both testified that, in fact, Mr. Reber consistently, at that time of his life, was using drugs and alcohol on virtually a daily basis. And so their testimony, for the most part, was consistent with other people who were at the party that night. The next point I'd like to make is that, with respect to the Alabama Court of Criminal Appeals' decision that there wasn't sufficient evidence, I think it's just factually wrong. And I think there's one critical point, and that is the Alabama Court of Criminal Appeals and the trial court focused to a large extent on the timing of the intoxication. And the reality is that the evidence that we put in at the Rule 32 hearing was that his drinking and drug use started in the middle of the afternoon and continued for several hours, so it really went pretty close to the time of the crime. There is testimony that this is not a timing issue. People don't sober up from alcohol, marijuana, crystal meth, and acid in a matter of minutes, and he was seen at dusk continuing to take drugs and to drink. Was there any testimony or information about his state of mind at the time when witnesses said that he had been patrolling the store? Was there any suggestion that that was also the result of intoxication? I'm not aware of specific testimony on that point. Of course, it's the same general time frame that we're talking about, but, no, I'm not aware of testimony where someone said, I remember when he left to essentially look at the store and then came back. I don't recall testimony on that in the record, Your Honor. Next, I'd like to just touch on the video. I think the video is actually critical here. It's remarkable that knowing the state had the video and knowing the state was going to put the video on and had a witness who was going to say, that looked like the guy I saw earlier in the day who was Jeff Reber, my high school classmate, that they didn't show Mr. Reber the video. Because, obviously, they had, even if it's a difficult video to tell whether, according to one witness, whether it's your brother, you could probably tell if it's yourself. And Mr. Gentle saw him that day. He's the only person who saw him that day, but he remembered seeing him that day and said, yeah, that's the same guy I saw earlier. I think it's quite clear that, while Mr. Kemner may have equivocated at some point in time, when asked the question, did you think that a lesser-included offense based on voluntary intoxication was viable, the answer was no, no. He went on to say it might be mitigated. Mitigating goes to penalty. But didn't the Alabama Court of Criminal Appeals also indicate that a lesser-included offense wouldn't have been available based on the evidence that could have been developed? Well, Your Honor, again, I do think the court was wrong in that regard, and it should have been a jury question. I think there was sufficient evidence between a combination of the Rogers report and the witnesses that we put on, including our expert witness who talked about if someone had taken the drugs for which there was firsthand evidence that Mr. Reber took. Well, there was firsthand evidence that he probably or might have taken those drugs, right? Well, I think if you go to... Like, everyone was high, so he must have been on LSD. Well, Sonny Blanton said she saw him snorting crystal meth, smoking pot, and drinking alcohol. So those three we've got actually saw him. Others saw him at least drinking and smoking. Mr. Maroney says there was LSD. He always took it. I'm pretty sure he took it. But you're right, he didn't see him, you know, place it in his mouth, for example. But this was 21 years, you know, after the offense. Um... It's okay, you can take 30 seconds to wrap up. Okay, thank you very much, Your Honor. Mr. Reber asks the court to grant a state-based corpus petition and reverse the district court's decision first as to guilt and to order a new trial or in the alternative as to sentencing and to order a sentencing hearing. Thank you very much. Thank you. Thank you both very much. The case was well argued, and we appreciate the help. Thank you, Your Honor. We're in recess. All rise. Thank you.